IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA24-770

Filed 17 September 2025

Surry County, No. 20CRS050971-850

STATE OF NORTH CAROLINA

       v.

BRIAN LEE THOMAS, Defendant.

Appeal by defendant from judgment entered 23 February 2024 by Judge Alyson A. Grine in Superior Court, Surry County. Heard in the Court of Appeals 22 April 2025.

*Attorney General Jeff Jackson, by Assistant Attorney General Sage A. Boyd, for the State.*

*Phoebe W. Dee for defendant-appellant.*

STROUD, Judge.

Brian Lee Thomas, Defendant, appeals from judgment entered following a jury's verdict finding him guilty of assault with a deadly weapon with intent to kill inflicting serious injury. Defendant argues the trial court plainly erred in giving the jury deficient instructions as to both self-defense and the defense of habitation. As to the defense of habitation instruction, the jury instructions failed to explain the presumption Defendant was in "reasonable fear of imminent death or serious bodily harm to himself or others" under North Carolina General Statute Section 14-51.2(b)

could be rebutted only by the circumstances listed in North Carolina General Statute Section 14-51(c). Also, the jury instructions did not clearly limit the application of the jury instruction on use of excessive force to the common law defenses of self-defense and lawful defense of a family member, while the State explicitly argued that the limitation as to excessive force did apply to defense of habitation just as it would for the common law defenses. This error rose to the level of plain error as the jury instructions as given had a probable impact on the jury's findings on the applicability of defense of habitation. We vacate Defendant's conviction and remand for a new trial.

## I.     Factual and Procedural Background

The evidence at trial tended to show on 9 April 2020, Surry County Sheriff's Office received a call reporting a "shooting . . . between neighbors[ ]" at 907 Oak Grove Church Road in Mount Airy, North Carolina. The neighbors were Defendant and Burt Wallace. Defendant's property and home, owned by his mother-in-law, was landlocked and only accessible through a dirt driveway easement granted by another neighbor, Harlan Stone. At some point in time, before the shooting on 9 April 2020, Wallace bought a small section of land from Stone including the gravel road easement used by Defendant and his family to access their property. After Wallace's purchase of this parcel, Defendant and Wallace began having disputes about Defendant's use of the gravel driveway and the actual location of the easement.

In November of 2019, "after a couple of disagreements about the easement[,]"

Wallace "erected a barrier" at the base of the gravel driveway. According to Defendant, this barrier prevented him and his family from driving their vehicles up to their house. Defendant and members of his family had to park their vehicles on the side of the road, using "4-wheelers" to access their home. Defendant also had a gate at the top of the gravel driveway that served as a barrier to his property.

Because the issue presented in this case arises from the jury instructions about self-defense and defense of habitation, we are required to consider the evidence in the light most favorable to Defendant. *See State v. Coley*, 375 N.C. 156, 162, 846 S.E.2d 455, 459 (2020). We recognize the State's evidence regarding the shooting disputes many of Defendant's claims, but due to the issue on appeal, we will summarize the evidence presented at trial based upon Defendant's evidence. Defendant testified there were many instances when Wallace was "drunk" and would "cuss[ at] anybody that walked down the [gravel] driveway[,]" telling them to "get the f[ ] off [his] property." Defendant testified he knew Wallace carried a gun on his person "the whole time I've lived there," "[p]retty much every day" and Defendant "never unblocked the barricade" himself because he "was too scared of what [Wallace] might do." Twice, during the time from November 2019 to April 2020, Defendant's stepmother needed to be transported by ambulance, and on one of these incidents, the ambulance was "not able to get up the driveway at all" because "they were being threatened if they moved anything in the easement to get up the driveway." Defendant called the sheriff's office "[m]ultiple" times, "probably 20, 30 times"

- 3 -

regarding the disputes over the driveway.

Defendant also testified that on 20 February 2020 he filed a complaint against Wallace and his wife at that time, Danielle, seeking a protective order under North Carolina General Statute Section 50C. On 20 February 2020, the District Court of Surry County entered a temporary no-contact *ex parte* order for "Stalking or Nonconsensual Sexual Conduct" against Wallace. The District Court found the *ex parte* order should be entered based on "[e]scalating behaviors. Criminal charges pending from incident in December, 2019." The specific unlawful conduct of Wallace noted by the order was that "[Wallace] has blocked [the] driveway and threatened [Defendant] on [19 February 2020]."[1] Defendant filed this complaint after Wallace's dogs "attacked" Defendant's "8-year-old daughter's service dog[.]" After this incident, Defendant had to leave to go to work, but when he returned home that evening about 6:30 or 7:00 p.m., "[Wallace] and his son [were] sitting in the foldup chairs as if they were waiting for [Defendant]."

As Defendant tried to pull his truck into the driveway, Wallace tried to open the truck's door. "[Wallace] was cussing, telling [Defendant] to get out, calling [Defendant] very negative things." Once Defendant got past the gate, "[Wallace] was standing at [the] gate yelling at [Defendant], telling [him] to get out and settle this like a man." Defendant testified Wallace "kept calling [him] a p---y." Wallace then

---

[1] A similar 50C order was entered against Danielle finding that "[Danielle] threatened to hurt [Defendant's] family."

began to walk away, and at first Defendant thought he was leaving, but he was "actually calling his son up there for something. And he c[a]me back as his son was approaching and held onto the gate and stepped in, and told [Defendant] to get out of [his] truck. That he was going to f---ing kill [Defendant]." Defendant's wife was on the porch during the time Wallace was threatening Defendant, and Defendant "called the [s]heriff's [office.]" The sheriff's office responded, and "they had people talking to [Wallace], trying to calm him down." The return hearing on the *ex parte* 50C order was initially set for 29 February 2020, but Defendant testified that they "never even got to go to court over it."

Defendant also testified about an incident on 7 April 2020, when Danielle was "blowing rocks all over the cars when [Defendant and his family] were trying to get out with [their] kids." Again, Defendant or his father called the sheriff's office because they "had the 50C in order."

On the evening of 9 April 2020, Defendant arrived home after doing some grocery shopping and going "out to eat." Wallace and Danielle were outside doing some yard work. After bringing the groceries inside, Defendant began driving up and down the driveway easement on a 4-wheeler he was working on because he was planning to sell it. Defendant's wife, father, and stepmother were also outside during this time, initially positioned at the top of the driveway near their house. Defendant testified that Wallace came out of the garage and started "videotaping [him] riding back and forth right there in the easement." Defendant told Danielle "there was a

50C in place, and it was [their] easement." Defendant kept riding the 4-wheeler, thinking "they were just going to videotape and, you know, maybe cuss or go back home." He didn't think it was "going to be like a big deal."

The last time Defendant rode through the gate and onto the easement, Wallace "reached out for [him]" and Defendant thought "this is getting a little bit more serious." Defendant testified he stopped the 4-wheeler and got off because he didn't "want, you know, any more trouble." At this time, Danielle was "closer to [Defendant's] stepmom and wife, closer to [Defendant's] property," and she was "yelling, saying stuff" to Defendant's family. Nothing physical had happened yet, but Defendant and his family had their cell phones out since the sheriff's office had told them "most of the time" nothing could be done because they couldn't prove anything happened. The sheriff's office told them "that anytime . . . [they] were going to do anything in the easement, that [they] needed to videotape [it], period." At the time of this incident, Defendant's wife, Defendant's stepmother, and Wallace were all videotaping.

Danielle then started the "physical confrontation" when she "attack[ed] [Defendant's] wife and step-mom." His stepmother's wrist was "broken in two spots" during this assault. At trial, Defendant presented evidence of his stepmother's x-rays and orthopedic medical treatment of the wrist fracture. This confrontation happened about six or seven feet from where Defendant was. Defendant's father tried to break up the fight between Danielle and Defendant's stepmother. Wallace "was coming

back up the driveway." Defendant testified Wallace dropped his cell phone "and c[a]me at [him], telling [him] to pull [his] gun, pull [his] gun. [Wallace] reached back in his pocket. [Defendant] thought he was reaching for a gun." Defendant "begged [Wallace] to stop three times. He didn't."

Defendant testified that he "was so scared at the moment because [his] kids, all three of them, [were] standing right behind me . . . [Defendant] pulled the trigger twice." At that time, he "figured [Wallace] was going to pull a gun and shoot [him] and possibly could get [his] kids that [were] standing behind [him]." Defendant testified Wallace was on Defendant's property when he shot him. Wallace took some steps backward before he fell to the ground. Defendant or his wife immediately called 911. Defendant testified at the time he shot Wallace, he believed that Wallace was armed. He later learned that Wallace was unarmed. Both shots stuck Wallace: one bullet entered his neck and exited through his shoulder, and the other went through his arm and "lodged" itself in his back.

At trial, Wallace's testimony confirmed that he and Danielle were out in the yard while Defendant was driving the 4-wheeler up and down the driveway and that he was videorecording this before the shooting, although he claimed Defendant had threatened him and he was trying to assist Danielle. He testified he could see that Defendant was armed with a "pistol on his hip[,]" and he believed Defendant was driving up and down the driveway as an attempt to "aggravate" him. Wallace walked "[r]ight up the left side of [the] driveway[,]" pulled out his cellphone, and began

videorecording Defendant. Defendant continued riding his 4-wheeler up and down the driveway. Wallace testified there were times when the "4-wheeler c[a]me close to striking" him. Danielle moved "closer to [Defendant's] property" and began exchanging "unpleasant" words with Defendant's wife and stepmother. This exchange of "unpleasant" words eventually turned into a physical fight. Wallace testified Defendant's wife and stepmother were "on top of" Danielle, and that he began running up the driveway towards the altercation to "pull them off of her." At this point, Defendant had "returned [the] 4-wheeler to [his] property" and was standing "right inside of [Defendant's property] gate." Wallace confirmed he began running up the driveway towards the altercation and towards Defendant's property. Wallace testified he could not remember everything Defendant said to him as he was running up the driveway, but did remember Defendant saying he was "going to shoot" him.

The first Surry County Sheriff's deputy arrived shortly after the shooting and Defendant handed over his firearm. Defendant went to the sheriff's office that night for an interview and gave a statement. Defendant returned to the sheriff's office again on 22 April 2020 to take part in another interview. Following the second interview, the Surry County Grand Jury indicted Defendant on 18 May 2020 for assault with a deadly weapon with the intent to kill inflicting serious injury. Defendant's case came for trial during the 19 February 2024 Superior Court, Surry County criminal session.

During a preliminary charge conference on 22 February 2024, the trial court and attorneys discussed proposed jury instructions. The State requested the definition of intent to be included, and Defendant requested an instruction on the lesser-included charge of assault with a deadly weapon inflicting serious injury. The trial court and the attorneys also acknowledged the need for further discussions relating to the defensive force instructions.

During the final charge conference, after the close of all evidence, the State agreed as to Defendant's requested instruction for defense of self and defense of a family member, but objected to Defendant's request to include a defense of habitation instruction. After some discussion, the trial court agreed with Defendant's argument the evidence of Wallace's forceful entry into the curtilage of the home would support a defense of habitation instruction. The jury was instructed on defense of self, defense of a family member, and defense of habitation.

After deliberation, the jury returned a verdict of guilty as to the charge of assault with a deadly weapon with intent to kill inflicting serious injury. The trial court sentenced Defendant as a prior record level I offender to a presumptive range of 58-82 months imprisonment. Defendant gave oral notice of appeal following sentencing on 23 February 2024.

## II. Analysis

Defendant presents four arguments on appeal. First, he argues the trial court committed plain error in providing the defense of habitation instruction because it

"failed to provide [him] with the immunity to which he was entitled[ ]" under North Carolina General Statute Section 14-51.2(c) (2023). Second, he argues the trial court plainly erred "by providing a self-defense instruction tracking the common law language rather than the statutory language of [North Carolina General Statute Section] 14-51.3." Third, Defendant argues in the alternative that he received ineffective assistance of counsel when his attorney "stipulated to the admission of a recorded interview wherein [Defendant] made statements that were both irrelevant . . . and extremely damaging to his defense." Finally, he argues "[c]umulative [e]rror" deprived him of a fair trial. Defendant's arguments regarding the jury instructions are dispositive so we will not address his additional arguments.

## A. Standard of Review

At trial, Defendant did not object to the proposed instructions relating to self-defense and defense of habitation. Without an objection at trial, this Court reviews only for plain error. *See* N.C. R. App. P. 10(a)(4) ("In criminal cases, an issue that was not preserved by objection noted at trial and that is not deemed preserved by rule or law without any such action nevertheless may be made the basis of an issue presented on appeal when the judicial action questioned is specifically and distinctly contended to amount to plain error."). Defendant has clearly and distinctly argued plain error on appeal.

The State contends we should not consider Defendant's arguments regarding the jury instructions even for plain error because any error in the jury instructions is

invited error. The trial court granted all Defendant's requests for instructions on self-defense, defense of habitation, and defense of a family member. The State objected to the instruction on defense of habitation, and Defendant had failed to give the State notice specifically of the defense of habitation, but the trial court gave this instruction over the State's objection. The State also notes the trial court granted Defendant's requests for specific changes to the wording of some instructions and ultimately, the trial court gave the instructions as requested and revised by Defendant.

Where the defendant has requested the jury instructions and consented to the instructions as given, "[t]he defendant will not be heard to complain on appeal[.]" *State v. Wilkinson*, 344 N.C. 198, 235-36, 474 S.E.2d 375, 396 (1996) (quotation marks omitted) ("Although [the] defendant labels th[e] assignment of error as 'plain error,' it is actually invited error because, as the transcript reveals, [the] defendant consented to the manner in which the trial court gave the instructions to the jury. The defendant will not be heard to complain on appeal when the trial court has instructed adequately on the law and in a manner requested by the defendant. If there was error in the charge, it was invited error and we shall not review it." (citations and quotation marks omitted)).

Defendant responds we should not consider the error in the instructions as invited error because at the time of the trial, neither counsel nor the trial court had the benefit of our Supreme Court's recent case addressing jury instructions on defense of habitation, *State v. Phillips*, 386 N.C. 513, 905 S.E.2d 23 (2024). The opinion in

*Phillips* was filed on 23 August 2024, about six months after Defendant's trial. In *Phillips*, our Supreme Court provided an extensive review of "the castle doctrine's evolution in North Carolina[,]" *id.* at 517, 905 S.E.2d at 27 (capitalization altered), and the "operation of Section 14-51.2[,]" *id.* at 521, 905 S.E.2d at 30 (capitalization altered). Our Supreme Court noted that

> the castle doctrine statute, entitled "Home, workplace, and motor vehicle protection; presumption of fear of death or serious bodily harm," is a clear and concise statutory enactment that has yet to be fully interpreted by this Court. Because this case squarely raises questions of the statute's meaning, we take this opportunity to clarify the scope of the castle doctrine in North Carolina.

*Id.* (citation omitted).

Because counsel and the trial court did not have the benefit of our Supreme Court's first detailed guidance on jury instructions on defense of habitation at the time of the trial,[2] we will not treat this issue as invited error. And although *Phillips* did not address the separate instruction on self-defense specifically, Defendant's

---

[2] We also note that Justice Barringer noted concern regarding these particular pattern jury instructions in *State v. Copley*, 386 N.C. 111, 126-27, 900 S.E.2d 904, 915 (2024) (Barringer, J., concurring) ("I write this concurrence to 'call out for clarity' in the pattern jury instructions associated with the various self-defense provisions that are now in place. *State v. Hicks*, 385 N.C. 52, 66-67, 891 S.E.2d 235 (2023) (Dietz, J., concurring). Roughly one year ago, this Court was faced with issues of the interplay between the castle doctrine and N.C.G.S. § 14-51.4. *See Hicks*, 385 N.C. 52, 891 S.E.2d 235. It appears that the state of the pattern jury instructions is still not improved as of today.

It is greatly concerning that our State's pattern jury instructions continue to leave jurors confused on what they may or may not consider in self-defense and castle doctrine circumstances. Further development of a strong underpinning to our State's castle doctrine jurisprudence requires clear jury instructions. Instructions that provide jurors with a clear decision tree are critical for a jury to be able to accurately determine whether the presumptions provided by [Section] 14-51.2 have been rebutted. A jury must intentionally and methodically determine whether that presumption has been rebutted.").

- 12 -

arguments here are all based upon the application of North Carolina General Statute Section 14-51.2 in the factual context of this case. As noted by Justice Barringer's concurring opinion in *State v. Copley*, at the time of Defendant's trial, "the various self-defense provisions" in the pattern jury instructions "continue[d] to leave jurors confused on what they may or may not consider in self-defense and castle doctrine circumstances." 386 N.C. 111, 126-27, 900 S.E.2d 904, 915 (2024) (Barringer, J., concurring). We will therefore consider Defendant's arguments of plain error in the jury instructions.

Our Supreme Court recently

> reiterated the standard for plain error review, clarifying that for a defendant to succeed, three things must be shown:
>
>> First, the defendant must show that a fundamental error occurred at trial. Second, the defendant must show that the error had a probable impact on the outcome, meaning that absent the error, the jury probably would have returned a different verdict. Finally, the defendant must show that the error is an exceptional case that warrants plain error review, typically by showing that the error seriously affects the fairness, integrity or public reputation of judicial proceedings.

*State v. Gillard*, 386 N.C. 797, 820, 909 S.E.2d 226, 250-51 (2024) (citation and quotation marks omitted).

**B. Defense of Habitation**

Defendant argues

[b]ecause the jury instructions allowed the jury to determine that the presumption that [Defendant] was in reasonable fear of death or serious bodily injury could be rebutted on bases other than those enumerated in [North Carolina General Statute Section] 14-51.2(c), the instruction, as given, failed to provide [Defendant] with the immunity to which he was entitled.

The jury was instructed on defense of habitation based on Pattern Jury Instruction for Criminal Cases No. 308.80, specifically as follows:

If the defendant assaulted the victim to prevent a forcible entry into the defendant's place of residence, or to terminate the intruder's unlawful entry, the defendant's actions are excused and the defendant is not guilty. The State has the burden of proving from the evidence beyond a reasonable doubt that the defendant did not act in the lawful defense of the defendant's place of residence.

The defendant was justified in using deadly force if:

(1) such force was being used to prevent a forcible entry or terminate the intruder's unlawful entry into the defendant's place of residence;

(2) the defendant reasonably believed that the intruder would kill or inflict serious bodily harm to the defendant or others in the place of residence; and

(3) the defendant reasonably believed that the degree of force the defendant used was necessary to prevent a forcible entry or terminate the intruder's unlawful entry into the defendant's place of residence.

A lawful occupant within a place of residence does not have a duty to retreat from an intruder in these circumstances. Furthermore, a person who unlawfully and by force enters or attempts to enter a person's place of residence is presumed to be doing so with the intent to commit an unlawful act involving force or violence. In addition, *absent evidence to the contrary*, the lawful occupant of a place of

residence is presumed to have held a reasonable fear of imminent death or serious bodily harm to himself or another when using defensive force that is intended or likely to cause death or serious bodily harm to another if both of the following apply:

> (1) The person against whom the defensive force was used was in the process of unlawfully and forcefully entering, or had unlawfully and forcibly entered, a place of residence; and

> (2) The person who used defensive force knew or had reason to believe that an unlawful and forcible entry or unlawful and forcible act was occurring or had occurred.

(Emphasis added.)

Defendant argues "[t]he jury was instructed that if it agreed . . . the castle doctrine applied to [Defendant]'s use of defensive force," then there was an automatic presumption Defendant "was in 'reasonable fear of imminent death or serious bodily harm to himself' or others" under North Carolina General Statute Section 14-51.2(b). *See* N.C. Gen. Stat. § 14-51.2(b) (2023). However, Defendant contends the jury was further instructed this "presumption could be rebutted by the State's evidence[,]" but the instructions provided "no limits . . . on the manner in which the presumption could be rebutted or the evidence the jury could properly consider while making this determination." Although the presumption is rebuttable, in *Phillips*, the Supreme Court held that this presumption can "*only* be rebutted" by the criteria provided in Section 14-51.2(c). *Phillips*, 386 NC at 525, 905 S.E.2d at 31 (emphasis added).

In *Phillips*, the Supreme Court held the jury instructions were in error because

they would have allowed the jury to consider the defendant's use of force to be "excessive," even if the jury also found that the defendant was a lawful occupant of the home who used defensive force against a person who "was in the process of unlawfully and forcefully entering" the home. *Id.* at 516, 905 S.E.2d at 27. According to *Phillips*, the presumption can be rebutted *only* by the circumstances listed in North Carolina General Statute Section 14-51(c):

> The presumption set forth in subsection (b) of this section shall be rebuttable and does not apply in any of the following circumstances:
>
> (1) The person against whom the defensive force is used has the right to be in or is a lawful resident of the home, motor vehicle, or workplace, such as an owner or lessee, and there is not an injunction for protection from domestic violence or a written pretrial supervision order of no contact against that person.
>
> (2) The person sought to be removed from the home, motor vehicle, or workplace is a child or grandchild or is otherwise in the lawful custody or under the lawful guardianship of the person against whom the defensive force is used.
>
> (3) The person who uses defensive force is engaged in, attempting to escape from, or using the home, motor vehicle, or workplace to further any criminal offense that involves the use or threat of physical force or violence against any individual.
>
> (4) The person against whom the defensive force is used is a law enforcement officer or bail bondsman who enters or attempts to enter a home, motor vehicle, or workplace in the lawful performance of his or her official duties, and the officer or bail

bondsman identified himself or herself in accordance with any applicable law or the person using force knew or reasonably should have known that the person entering or attempting to enter was a law enforcement officer or bail bondsman in the lawful performance of his or her official duties.

(5) The person against whom the defensive force is used (i) has discontinued all efforts to unlawfully and forcefully enter the home, motor vehicle, or workplace and (ii) has exited the home, motor vehicle, or workplace.

N.C. Gen. Stat. § 14-51(c) (2023).

The State does not contend that any of these listed circumstances exist in this case. There is no dispute that Defendant was a "lawful occupant" of his own property. Therefore, applying this statute to the evidence presented in this case, if the jury determined that Wallace was "in the process of unlawfully and forcefully entering, or had unlawfully and forcibly entered" the curtilage of Defendant's home, and Defendant "knew or had reason to believe that an unlawful and forcible entry or unlawful and forcible act was occurring or had occurred" under Section 14-51.2(b), then Defendant "is presumed to have held a reasonable fear of imminent death or serious bodily harm to himself or herself or another when using defensive force that is intended or likely to cause death or serious bodily harm to another." N.C. Gen. Stat. § 14-51.2(b).

Defendant notes that the verdict sheet "did not require the jury to indicate what their findings of fact were regarding whether (1) [Defendant] was in the

curtilage of his home, (2) whether Wallace was in the process of entering or (3) had entered the curtilage of [Defendant]'s home." The jury instructions also failed to make the distinction in the applicable law for self-defense depending on what the jury believed about the exact circumstances of the shooting. These facts are determinative because the jury was instructed on both common law self-defense (and lawful defense of a family member) as well as defense of habitation. Based on the evidence here, the defenses available to Defendant would depend on the jury's determination as to these disputed facts. If the jury determined Wallace had unlawfully or forcefully entered the curtilage of Defendant's home, and Defendant was aware of this entry, then the jury would be required to consider the presumption afforded by the defense of habitation instruction. But Defendant still had a potential defense, even if the jury determined Wallace had *not* unlawfully or forcefully entered the curtilage of Defendant's property, since the jury could still consider the potential defenses of self-defense and defense of a family member. Of course, the bar is higher for Defendant on those defenses, as there is no statutory presumption Defendant had a "reasonable fear of imminent death or serious bodily harm to himself or herself or another," and common-law self-defense is limited by the requirement that Defendant not use "excessive force." *Id.*; *see also Phillips*, 386 N.C. at 520, 905 S.E.2d at 29.

Although the trial court did not give an instruction as to "excessive force" within the "defense of habitation" instruction as in *Phillips*, the instruction was given twice without clarifying that it would not apply in the context of the defense of

habitation instruction. The trial court gave the instruction on excessive force twice, with the instruction on self-defense and with the instruction on lawful defense of a family member. Immediately before the instruction on the defense of habitation as quoted above, the instruction on excessive force[3] stated:

> A defendant does not have the right to use excessive force. The [D]efendant had the right to use only such force as reasonably appeared necessary to the [D]efendant under the circumstances to protect a family member from death or great bodily harm. In making this determination, you should consider the circumstances as you find them to have existed from the evidence, including the size, age and strength of the [D]efendant and the family member as compared to the victim, the fierceness of the assault, if any, upon the family member, whether the victim had a weapon in the victim's possession, and the course of conduct of the parties. You, the jury, determine the reasonableness of the [D]efendant's belief from the circumstances appearing to the [D]efendant at that time.

In reviewing the jury instructions, we must consider them in context and in their entirety to determine if they are in error:

> We review the jury instructions in their entirety to determine if the jury may have been misled or misinformed about the applicable law:
>
>> The charge of the court must be read *as a whole, in the same connected way that the judge is supposed to have intended it and the jury to have considered it.* It will be construed contextually, and isolated portions will not be held prejudicial when the charge as whole

---

[3] The trial court gave the instruction regarding use of excessive force based on N.C.P.I. –Criminal 308.45 (self-defense) and N.C.P.I. – Criminal 308.50 (defense of family member) twice, with the instructions on self-defense and lawful defense of a family member. The instruction on excessive force was essentially the same as the instruction in *Phillips*. *See* 386 N.C. at 515-16, 905 S.E.2d at 26.

> is correct. If the charge presents the law fairly and
> clearly to the jury, the fact that some expressions,
> standing alone, might be considered erroneous will
> afford no ground for reversal.

*State v. Wilson*, 297 N.C. App. 535, 538-39, 910 S.E.2d 407, 410 (2024) (emphasis added) (citation and quotation marks omitted). Here, reviewing the jury instructions "in the same connected way that the judge" gave them and the jury would have considered them in their entirety, the instructions are misleading. *Id.* (citation and quotation marks omitted). Even though the instructions regarding use of excessive force are correct in the context of the instructions on self-defense and defense of a family member, the instructions did not clarify that the instructions on "excessive force" would *not* apply in the jury's consideration of the defense of habitation.

Defendant also argues that this error in the instructions was "greatly compounded by the prosecutor's repeated calls for the jury to dismiss [Defendant]'s defense if the jury concluded that his force was excessive." The State argued to the jury that for Defendant to be entitled to use any type of self-defense, whether defense of self, defense of others, or defense of habitation, the jury had to conclude that Defendant reasonably believed "this assault was necessary to protect him from imminent death or great bodily harm." In closing, the State argued "[a] defendant is never entitled to use excessive force. The law allows only such force as reasonably appeared necessary to protect from death or great bodily harm." Under the jury instructions as given, the State's argument was logical, but the instructions had

conflated the requirements for common-law defense of self or defense of a family member – which may occur anywhere – and the statutory defense of habitation – which may occur only in or related to the forceful entry of the Defendant's "home, motor vehicle, or workplace" in the circumstances stated in Section 14-51.2. N.C. Gen. Stat. § 14-51.2(b).

Our State's statutes and precedents have long recognized an individual's right to protect and defend themselves, their family, and their home and curtilage. "The principle that *one does not have to retreat* regardless of the nature of the assault upon him *when he is in his own home* and acting *in defense of himself, his family and his habitation* is firmly embedded in our law." *State v. McCombs*, 297 N.C. 151, 156, 253 S.E.2d 906, 910 (1979) (emphasis added) (citations omitted).

Our Supreme Court recently noted the critical importance of the jury instructions in a case addressing a similar assertion of self-defense and defense of habitation in *State v. Coley*:

> The jury charge is one of the most critical parts of a criminal trial. It is the duty of the trial court to instruct on all substantial features of a case raised by the evidence. This Court has consistently held that where competent evidence of self-defense is presented at trial, the defendant is entitled to an instruction on this defense, as it is a substantial and essential feature of the case, and the trial judge must give the instruction even absent any specific request by the defendant. In determining whether a defendant has presented competent evidence sufficient to support a self-defense instruction, we take the evidence as true and consider it in the light most favorable to the defendant. Once a showing is made that the defendant has

> presented such competent evidence, the court must charge on this aspect even though there is contradictory evidence by the State or discrepancies in [the] defendant's evidence. A defendant entitled to *any* self-defense instruction is entitled to a *complete* self-defense instruction, which includes the relevant stand-your-ground provision.

375 N.C. at 159, 846 S.E.2d at 457-58 (emphasis original) (citations, brackets, and quotation marks omitted).

The State notes that language of the jury instructions tracks the North Carolina School of Government's Pattern Jury Instruction for Defense of Habitation, *see* N.C.P.I. Crim. 308.80, but unfortunately, the version of the pattern instruction used in this case – the same version noted as "confus[ing]" by Justice Barringer in the concurring opinion in *Copley*, *see* 386 N.C. at 126-27, 900 S.E.2d at 915 (Barringer, J., concurring) – did not have the benefit of updates based on either *Copley* or *Phillips*. In fact, the State's primary argument is the instructions followed N.C.P.I. Crim. 308.80. Although pattern jury instructions are normally the "preferred method of jury instruction[,]" *Caudill v. Smith*, 117 N.C. App. 64, 70, 450 S.E.2d 8, 13 (1994) (citation omitted), they have "neither the force nor effect of the law" and they "may be erroneous and need alteration to conform with the law." *State v. Ferebee*, 137 N.C. App. 710, 714-15, 529 S.E.2d 686, 689 (2000) ("Although the given charge tracked applicable pattern jury instructions, pattern instructions, which have neither the force nor effect of the law, may be erroneous and need alteration to conform with the law." (citations omitted)). The pattern jury instructions at issue in

this case are in "need of alternation to conform with the law" based upon our Supreme Court's guidance. *Id.*

The State's secondary argument is the trial court erred because the jury instruction on defense of habitation should not have been given at all, noting that the instruction was given over the State's objection. But the State's argument is based upon a view of the evidence in the light most favorable to the State, not the proper standard, which is to view the evidence in the light most favorable to the Defendant. *See Coley*, 375 N.C. at 162, 846 S.E.2d at 459 ("Viewing the evidence at trial in the light most favorable to [the] defendant in order to determine whether the evidence was competent and sufficient to support the jury instructions on self-defense and the defense of habitation, we conclude that [the] defendant was entitled to both instructions."). The State is correct there was conflicting evidence regarding whether Wallace had actually entered Defendant's property and how far onto Defendant's property Wallace had progressed, if he had entered at all, at the time he was shot. The evidence in the light most favorable to the State would indicate that Wallace was not even on Defendant's property when he was shot and he was moving in that direction only to assist Danielle, who was engaged in a fight with Defendant's wife and stepmother. But for purposes of instructions on a defense, including defense of habitation, the trial court must view the evidence in the light most favorable to the defendant. *See id.* The evidence in the light most favorable to Defendant required the trial court to give the instruction on the statutory defense of habitation. *See State*

*v. Dooley*, 285 N.C. 158, 163, 203 S.E.2d 815, 818 (1974) ("Where there is evidence that [the] defendant acted in self-defense, the court must charge on this aspect even though there is contradictory evidence by the State or discrepancies in [the] defendant's evidence." (citations omitted)). Thus, the only question for us on appeal is whether the instruction as given constituted plain error.

Defendant argues including language of "absent evidence to the contrary[,]" without also including the statutory bases in which the presumption could be rebutted, this instruction "erroneous[ly] . . . allowed the jury to consider any evidence it deemed appropriate to the determination of whether the presumption had been rebutted." In the context of this case and based on the instructions given, the jury could believe that "evidence to the contrary" would be evidence that Defendant used excessive force, but this is not a proper consideration under the defense of habitation.

In *Phillips*, our Supreme Court explained how the castle doctrine operates, the presumption North Carolina General Statute Section 14-51.2 provides, and the limited instances in which the presumption can be rebutted:

> The statute operates as follows. First, any person who "unlawfully and by force enters or attempts to enter" a home is "presumed to be doing so with the intent to commit an unlawful act involving force or violence," and this presumption is non-rebuttable. Second, a lawful occupant of a home who knows or has reason to believe such unlawful entry or attempted entry occurred or is occurring, and who uses force against the intruder that is intended or likely to cause death or serious bodily injury, is "presumed to have held a reasonable fear of imminent death or serious bodily harm" and has no duty to retreat from the intruder.

Finally, if a lawful occupant of a home uses deadly force as permitted by this statute, he or she is "immune from civil or criminal liability for the use of such force," subject only to a narrow exception not relevant here.

However, the statutory presumption of a lawful occupant's reasonable fear of death or serious bodily harm is "rebuttable and does not apply in any of the circumstances" listed in [North Carolina General Statute Section 14-51.2] subsection (c). The plain language of subsection (c), and the legislature's clear intent to significantly broaden castle doctrine protections by repealing section 14-51.1 and enacting section 14-51.2, compels the conclusion that the presumption of reasonable fear may be rebutted *only by the circumstances set forth in subsection (c)*.

386 N.C. at 524, 905 S.E.2d at 31 (2024) (emphasis added) (citations, ellipses, and original emphasis omitted). Under North Carolina General Statute Section 14-51.2, the presumption of "reasonable fear of imminent death or serious bodily harm" may only be rebutted by evidence of any of the five circumstances outlined in North Carolina General Statute Section 14-51(c). *See* N.C. Gen. Stat. § 14-51.2(c).

Defendant relies on *Phillips* in arguing because the jury was not presented with the statutorily outlined circumstances for rebutting the presumption, and allowed to "consider any evidence it deemed appropriate" in "determin[ing] . . . whether the presumption had been rebutted[,]" Defendant was erroneously denied protections afforded under the castle doctrine. In *Phillips*, our Supreme Court explained "if the presumption could be rebutted by other circumstances[ ]" not outlined by Section 14-51.2(c), "such as the victim's relative size or strength," then the presumption and statutorily granted protections "would serve no purpose." 386

N.C. at 524, 905 S.E.2d at 31 ("There is no meaningful difference between a jury considering whether a victim's inferior strength rebutted the presumption of the defendant's reasonable fear under the castle doctrine statute and a jury considering whether a victim's inferior strength undercut the defendant's attempt to demonstrate his or her reasonable fear under the general self-defense statute."). Similar to the case at bar, the trial court's jury instruction in *Phillips* also included the language of "[a]bsent evidence to the contrary[.]" *Id.* at 516, 905 S.E.2d at 26 (brackets omitted).

Although the instruction on excessive force in *Phillips* was included within the instruction on defense of habitation and here it was technically included within the instructions on self-defense and defense of family, it was given immediately before the instruction on defense of habitation and the instructions here do not clearly limit the application of the instruction on "excessive force" to a particular defense. Particularly where the jury was instructed that it may consider "evidence to the contrary" without any limitation within the instruction of defense of habitation, and the State's repeated argument that "excessive force" *should* be considered for all the defenses, there is no practical difference between the instruction in *Phillips* and in this case. Specifically, the jury in *Phillips* was instructed that

> the defendant does not have the right to use excessive force. The defendant had the right to use only such force as reasonably appeared necessary to the defendant under the circumstances to protect the defendant from death or great bodily harm. In making this determination you should consider the circumstances you find to have existed from the evidence including the size, age, and strength of the

- 26 -

defendant as compared to the victim; the fierceness of the assault, if any, upon the defendant; and whether the victim possessed a weapon.

*Id.* at 516, 905 S.E.2d at 27. The trial court's instruction in *Phillips* was "contrary to law[ ]" because it added the qualifier that "even if the castle doctrine applied, 'the defendant d[id] not have the right to use excessive force' and that 'the defendant had the right to use only such force as reasonably appeared necessary to protect the defendant from death or great bodily harm.'" *Id.* at 526, 905 S.E.2d at 32 (brackets and ellipses omitted). Our Supreme Court determined and concluded this instruction was erroneous as it did not comply with the "clear and unambiguous" language of North Carolina General Statute Section 14-51.2. *Id.* at 526-27, 905 S.E.2d at 32-33 (citation and quotation marks omitted).

Here, excessive force was addressed within the trial court's instructions on self-defense and defense of a family member, not *technically* within the paragraph including the defense of habitation instruction, but that subtle difference would not be discernable to the members of the jury listening to the instructions. The jury was not lawfully and fully instructed the requirements of the defenses of self-defense, defense of family, and defense of habitation were different in regard to how "excessive force" is considered, and the State argued that there was *no* difference. Therefore, Defendant has demonstrated that the trial court's instructions as to defense of habitation were in error.

## C. Plain Error

Since we have determined that the trial court's jury instructions on defense of habitation were erroneous, we must next consider whether Defendant has established this error rises to the level of plain error. Our Supreme Court has recently clarified the application of the plain error rule where there has been an error as to admission of evidence or in the jury instructions but the defendant did not preserve his arguments by objection at trial:

> This preservation rule serves crucial functions in our justice system. First, and most obviously, it promotes the efficiency of a justice system with limited resources. When a party alerts the trial court of a potential error, the court can correct it. For example, with an evidentiary objection, the trial court can refuse to admit the evidence or offer a limiting instruction to the jury. If the error is not identified until after the trial, the only option is to set aside the judgment and order a new trial. This is an incredibly costly alternative.

> Second, this preservation rule reduces the risk of "gamesmanship" in the appellate process. As noted above, when there is a reversible evidentiary or instructional error in a criminal trial, the remedy on appeal is to vacate the judgment and remand for a new trial. A preservation requirement prevents parties from allowing evidence to be introduced or other things to happen during a trial as a matter of trial strategy and then assigning error to them if the strategy does not work.

> Despite the important functions of this preservation rule, its application can be harsh. There will be times when the lack of preservation means the trial court committed a reversible error but the aggrieved party cannot raise that error on appeal.

*State v. Reber*, 386 N.C. 153, 157, 900 S.E.2d 781, 786 (2024) (citations and quotation

marks omitted).

We first note Defendant did "alert[ ] the trial court" by requesting an instruction on defense of habitation, while the State argued this instruction should not be given. *Id.* The transcript shows that the trial court carefully considered how to instruct on this issue, and the proper instruction, in light of the confusion arising from the interaction of the common law with Section 14-51.2, was by no means obvious at that time. Defendant notes that

> the interpretation of our defense of habitation statutes is evolving. In 2019, John Rubin, long recognized as the School of Government academic with the soundest grasp of North Carolina's self defense rules, wrote
>
>> I must admit that I did not fully appreciate the significance of the [2011] statutes when they appeared. I saw them as revising, supplementing and clarifying the common law. Now that we have almost twenty reported appellate decisions that have grappled with the statutes (as well as some unpublished opinions), I can see I had it wrong.

During several discussions with counsel throughout the trial regarding the jury instructions, the trial court carefully considered some of the publications of Mr. Rubin and the School of Government as to how to instruct the jury on this issue. And after the trial, our Supreme Court provided a clear analysis of these issues in *State v. Phillips*, but the trial court did not have the benefit of that guidance at the time of the trial. This is not a situation where the parties have engaged in gamesmanship or assented to an erroneous instruction where the law was already clear. Concerns

of efficiency and judicial economy cannot overcome clear legal error in this type of situation.

For the same reasons, this case does not present the appearance of "gamesmanship" in the appellate process. *See id.* An evidentiary error, as considered in *Reber*, is a bit different from an instruction error such as the one in this case. As noted above, this instruction on defense of habitation was given in the context of evolving and unclear law which was later clarified by *State v. Phillips*. *Reber* then states the standard for plain error review:

> Plain error exists for the rare cases where the harshness of this preservation rule vastly outweighs its benefits. When we first recognized the rule in *Odom*, we emphasized that it was available only in extraordinary cases. We explained that it should be applied cautiously and only in the exceptional case, that it is reserved for grave error which amounts to a denial of a fundamental right of the accused, and that it focuses on error that has resulted in a miscarriage of justice or the denial of a fair trial.

*Id.* at 158, 900 S.E.2d at 786 (citations and quotation marks omitted).

Defendant contends the trial court was

> participating in the ongoing process, evolving in our trial courts, of learning how best to instruct our juries on the nuances of the application of statutory self-defense in North Carolina. Ultimately, justice requires everyone tried for the same crime be treated in the same way and have the same law apply.

(Quotation marks omitted.) Defendant argues he should not be "penalized because his case was tried before our trial courts understood the importance of supplementing

the defensive force instructions with an explanation of the limited grounds upon which this presumption can be rebutted."

Our Supreme Court explained the fundamental importance of this jury instruction as well as the need for clarification of the law in *Phillips*:

> An individual has a fundamental right to defend his or her home from unlawful intrusion. This principle of personal liberty is grounded in natural law and English common law. Commonly known as the castle doctrine, the legislature codified and expanded the fundamental right of defense of habitation in Chapter 14 of the North Carolina General Statutes. Thus, the common law may aid our understanding, but statutes set the boundaries of the law in this area. This case presents us with the opportunity to clarify the castle doctrine as established by the legislature.

*Phillips*, 386 N.C. at 514, 905 S.E.2d at 25 (citations omitted).

Under the facts of this case, we conclude the error in the jury instructions did have a probable effect on the outcome of the trial and the error resulted in "the denial of a 'fair trial.'" *Reber*, 386 N.C. at 158, 900 S.E.2d at 786 (citation omitted). Defendant argues the error in the instruction on defense of habitation was a "fundamental error" because jury instructions are fundamental to a fair trial. Our Supreme Court has recognized that where there is "highly conflicting evidence" along with an "instructional error," this error may have "tilted the scales" to cause the jury to reach its guilty verdict. *State v. Tucker*, 317 N.C. 532, 540, 346 S.E.2d 417, 422 (1986) (quotation marks omitted). Here, there was conflicting evidence as to whether Wallace had forcibly entered Defendant's property and the jury was not properly

instructed on a statutory presumption which might have given Defendant immunity

"from civil or criminal liability for the use of such force." N.C. Gen. Stat. § 14-51.2(e).

Defendant argues the erroneous instruction "had a probable impact" on the

outcome of the trial. He contends:

> [b]ecause the verdict forms didn't require the jury to make
> specific findings of fact, for instance whether [Defendant]
> was located in the curtilage of his home or whether Wallace
> was in the process of forcefully entering the curtilage of
> [Defendant]'s home, it is possible that at least some of the
> jurors believed that [Defendant] was entitled to the castle
> doctrine protections but also believed that the State's
> evidence was sufficient to rebut the presumption that he
> was in reasonable fear of death or grave injury. In other
> words, since the jury instructions allowed the jury to find
> the State had rebutted that presumption on impermissible
> grounds, it allowed them to convict on a theory contrary to
> law. These were the central issues at trial and the jury
> being incorrectly instructed on how to apply the castle
> doctrine is likely to have impacted the verdict.

Again, the State relies mainly on its argument it had objected to Defendant's

request to have the defense of habitation instructed to the jury. The State argued to

the trial court that the pattern jury instruction "reads if the assault occurred in

[D]efendant's home, place or residence, workplace or motor vehicle, use the defense

of habitation instruction 308.80. This did not occur within the home. It occurred on

[the] property. But that's entirely different." The State argues "the only evidence to

support that Wallace had stepped onto . . . Defendant's property c[a]me[ ] from . . .

Defendant, who stated Wallace was one foot in the gate [of Defendant's property]

when he shot Wallace." According to the State, because Defendant was not entitled

to the defense of habitation instruction, "Defendant cannot show the requisite prejudice to establish plain error."

We have already rejected the State's argument regarding the need for the defense of habitation instruction. We view the evidence in the light most favorable to Defendant for purposes of the instructions on self-defense, including defense of habitation. The State also argues the instructions would not have changed the result because the evidence shows "Wallace was headed one of two places either he was headed toward his ex-wife who was located outside of Defendant's gate (on the easement) to break up the scuffle or he was headed toward Defendant. There is no evidence that Wallace headed toward Defendant's place of residence." But again, the State's argument presumes the jury instructions were correct and views the evidence in the light most favorable to the State to contend that Defendant has failed to demonstrate a fundamental error or a probable effect on the outcome of the trial.

The State makes assumptions about the facts the jury may not have made and based upon incorrect instructions. As Defendant notes, "[w]e don't know if the jury determined that Wallace was in the process of 'unlawfully and forcibly' entering the curtilage of [Defendant]'s home[,]" but "[w]e do know" the evidence does not support any of the circumstances rebutting the presumption listed in Section 14-51.2(c) applied to this case. *See* N.C. Gen. Stat. § 14.51.2(c). The State also repeatedly argued Defendant's use of "excessive force" would deprive him of self-defense immunity under any scenario. Since the jury instructions did not address the limited

means of rebuttal, Defendant contends that

> we must [pre]sume that members of the jury concluded that [Defendant] was in the curtilage of his home and that Wallace was either in the process or had completed entry into [Defendant's] curtilage. Assuming that the jurors could have so found, we must further conclude that they believed the State had presented evidence that rebutted [Defendant]'s presumption of "reasonable fear of imminent death or serious bodily harm to himself" or others, as was argued for vigorously by the State in closing.

We therefore conclude the trial court erred by failing to address the specific instances stated in Section 14-51.2(c) which may rebut the presumption created by Section 14-51.2(b) and by failing to clearly limit the application of the instruction on "excessive force" solely to the defenses of common law self-defense and defense of family members, in accord with *Phillips*. This error rises to the level of plain error for the reasons addressed above. We vacate Defendant's conviction and remand for a new trial with proper instructions on self-defense, defense of a family member, and defense of habitation in compliance with Section 14-51.2 and *State v. Phillips*. *See id.*

Defendant has raised other issues on appeal, but as those issues may not recur in the trial on remand, we have not addressed those issues.

### III. Conclusion

Based on plain error in the jury instructions, Defendant was prejudicially denied his right to self-defense of habitation. For the reasons discussed above, we vacate Defendant's conviction and remand for a new trial.

NEW TRIAL.

Judges TYSON and HAMPSON concur.